WISCONSIN DEPARTMENT OF REVENUE, Appellant, v. A. O. SMITH HARVESTORE PRODUCTS, INC., Respondent.*

*No. 754 (1974). Argued March 4, 1976.—
Decided April 7, 1976.*
(Also reported in 240 N. W. 2d 357.)

* Motion for rehearing denied, without costs, on June 30, 1976.

For the appellant the cause was argued by *E. Weston Wood,* assistant attorney general, with whom on the briefs was *Bronson C. La Follette,* attorney general.

For the respondents there was a brief by *Thomas G. Ragatz, James F. Lorimer, David F. Grams* and *Boardman, Suhr, Curry & Field* of Madison, and oral argument by *Mr. Ragatz.*

WILKIE, C. J. The plaintiff-appellant, Wisconsin Department of Revenue, determined sales tax due by the defendant-respondent, A. O. Smith Harvestore Products, Inc., in the amount of $264,228.99 for the period from September 1, 1969, to May 9, 1971, on sales by the respondent to dealers of the component parts for a blue, cylindrical structure known as a Harvestore. This determination was reversed by the tax appeals commission, which, in turn, was affirmed by the circuit court. We reverse.

The usual assembly kit for a Harvestore includes 105 steel sheets, about 7,000 bolts, and sealant. The Harvestore, as erected by a dealer on farmland, typically

stands 20 feet in diameter and 70 feet high, weighs about 30 tons, and costs in the vicinity of $22,000. The Harvestore is erected on a concrete slab that may weigh 60 tons.

The Harvestore itself is a structure which converts fodder into silage in a more effective manner than the conventional silo. Oxygen is excluded from and carbon dioxide is retained within the glass-lined steel walls of the Harvestore. Breather bags, which are sold as part of each Harvestore unit, are installed at the top of the structure to compensate for changes in barometric pressure and temperature. These bags enhance the natural conversion of fodder into silage. While a conventional silo unloads from the top, a Harvestore is unloaded from the bottom by means of a mechanical unloader, which is part of the structure. The sale of these unloaders is in no way involved in this dispute.

When Harvestore did not collect taxes on sales to its dealers between September 1, 1969, and September 30, 1970, the Department assessed additional sales tax for this period in the amount of $163,836.52. Although Harvestore did collect taxes in the amount of $100,392.47 for the period from October 1, 1970, to May 9, 1971, it petitioned the Department for a refund, which was declined. The tax appeals commission ruling reversing these actions of the Department is the subject of this appeal.

One issue is dispositive of this appeal: Is the sale of the component parts of the Harvestore by the manufacturer to its dealers taxable on the ground that it is a sale of construction materials to contractors for the erection of structures or improvements of real property, within the meaning of sec. 77.51 (4) (i), Stats.?[1]

[1] Sec. 77.51 (4), Stats.: "(4) 'Sale,' 'sale, lease or rental,' 'retail sale,' 'sale at retail,' or equivalent terms include any one or all of the following: the transfer of the ownership of, title to, possession of, or enjoyment of tangible personal property or ser-

### Standard of review.

The first crucial matter to be determined on this appeal is the proper standard of review to be applied. The respondent asserts that the commission determination that a Harvestore is personal property and therefore not a structure or improvement of real estate, is a finding of fact. Under its findings of fact, the commission did find (under finding 32) that the Harvestore unit "when assembled and set upon farm property, retains its character as personal property." The commission made the very same determination as a conclusion of law.

The essential matter to be determined in this case is whether the facts found by the commission fulfill a particular legal standard. The legal standard has both a statutory and a common-law aspect. The statutory element is whether the sale to Harvestore dealers is a sale of "building materials . . . to . . . contractors . . . for the erection of . . . structures . . . or improvement of real property," within the meaning of sec. 77.51 (4) (i), Stats. The common-law element arises from the necessity that the Harvestores be considered real property or fixtures, rather than personal property.

This court has uniformly held that whether or not the facts found fulfill a particular legal standard is a question of law, not a question of fact.[2] Due deference must be accorded the agency's application of the law to

vices for use or consumption but not for resale as tangible personal property or services and includes:

" . . .

"(i) Sales of building materials, supplies and equipment to owners, contractors, subcontractors or builders for the erection of buildings or structures or the alteration, repair or improvement of real property. Such transactions are deemed retail sales in whatsoever quantity sold."

[2] *Fish v. White Equipment Sales & Service, Inc.* (1974), 64 Wis. 2d 737, 742, 221 N. W. 2d 864; *Cheese v. Industrial Comm.* (1963), 21 Wis. 2d 8, 15, 123 N. W. 2d 553. *See also: Teledyne Industries, Inc. v. Milwaukee* (1974), 65 Wis. 2d 557, 565, 223 N. W. 2d 586.

the found facts when the agency has particular competence or expertise in the matter at hand.[3] However, such deference is not required when this court is as competent as the agency to decide the question involved.[4] In the field of taxation, this court held in *Pabst v. Department of Taxation*[5] that, while it might defer to the agency in a matter involving accounting procedures, it was as competent as the agency in deciding a question of trust administration. In the case at bar this court is as competent as the commission to decide whether a Harvestore is real or personal property. The only dispute to be resolved here is the legal conclusion to be drawn from facts that are essentially agreed to and undisputed. This is a question of law.

*Sale of "building materials" to "contractors" for the erection of "structures" or "improvements of real property."*

Normally the sales tax is not imposed on the manufacturer-dealer transaction, but upon the dealer-customer transaction, since this is the final "retail" sale. However, when this final transfer involves the construction of real-property structures or improvements, the sales tax cannot be imposed at this level because there is no transfer of tangible personal property. In such a situation, sec. 77.51 (4) (i), Stats., defines the manufacturer-dealer transaction as a "retail" sale, and imposes the sales tax at this level. This approach is not unusual, and has been followed in many other states.[6]

---

[3] Sec. 227.20 (2), Stats.

[4] *Pabst v. Department of Taxation* (1963), 19 Wis. 2d 313, 323, 324, 120 N. W. 2d 77.

[5] *Id.*

[6] See, for example: *Department of Revenue v. James A. Head & Co., Inc.* (1974), 54 Ala. App. 136, 306 So. 2d 5; *Material Service Corp. v. Isaacs* (1962), 25 Ill. 2d 137, 183 N. E. 2d 164; *Craftsman Painters & Decorators, Inc. v. Carpenter* (1942), 111 Colo. 1, 137 Pac. 2d 414.

The threshold questions are whether the Harvestore component parts are "building materials" and whether the dealers are "consumers" of these parts within the definition of "contractors" given in sec. 77.51 (18), Stats. The term "building materials" is not limited to that which is used to construct a building with four sides and a roof, but includes materials of all kinds used in construction work.[7] The Harvestore parts are building materials because they are used to erect a freestanding structure on land.

Contractors are defined in sec. 77.51 (18), Stats., as "consumers of tangible personal property used by them in real property construction activities." Because the dealers sell to farmers the completed structure rather than the individual parts purchased from the manufacturer, it must be concluded that they consume and use the kits in creating a new and different product. The fact that the parts are prefabricated only facilitates the construction job of the dealer; it does not prevent a conclusion that the dealer consumes and uses the kits.

The precise question to be determined in this case is whether the dealers are engaged in the construction of real property structures or improvements. In other words, is the Harvestore, when assembled on farm property, a fixture and therefore part of the realty?

This court has long followed a three-part test to determine whether or not particular articles of property are fixtures:

"'. . . Whether articles of personal property are fixtures, *i.e.*, real estate, is determined in this state, if not generally, by the following rules or tests: (1) Actual physical annexation to the real estate; (2) application or adaptation to the use or purpose to which the realty is devoted; and (3) an intention on the part of the person

---

[7] *Wood Preserving Corp. v. State Tax Commission* (1938), 235 Ala. 438, 179 So. 254.

making the annexation to make a permanent accession to the freehold.' "[8]

Although the application of this test is normally a question of fact, it becomes a question of law when only one reasonable conclusion may be drawn from the evidence.[9] In the instant case, the issue is legal rather than factual because the meaning and application of a statutory standard is involved as distinguished from an evidentiary dispute over the actions and intentions of two private parties.

*Annexation.*

We conclude as a matter of law that this criterion has been met. The Harvestore is firmly attached and affixed to a concrete foundation set in the ground specifically for this purpose. Numerous bolts are used to affix the Harvestore to the foundation. Indeed, in its advertising Harvestore emphasizes that the unit is so firmly attached to the ground that it can and has withstood the force of a tornado.

*Adaption.*

The Harvestore is clearly adapted to the use to which the realty is devoted. The Harvestore stores and processes fodder into silage, and this is clearly adapted to the use to which the farm realty is devoted.

*Intention.*

The factor of intention is regarded as the most important of the three factors.[10] The determinative intent

---

[8] *Premonstratensian Fathers v. Badger Mut. Ins. Co.* (1970), 46 Wis. 2d 362, 367, 175 N. W. 2d 237, quoting *Standard Oil Co. v. La Crosse Super Auto Service* (1935), 217 Wis. 237, 240, 241, 258 N. W. 791. The source of the test is *Teaff v. Hewitt* (1853), 1 Ohio St. 511, 59 Am. Dec. 634.

[9] Brown, *Personal Property* (2d ed. 1955), p. 703, sec. 137.

[10] *Premonstratensian Fathers v. Badger Mut. Ins. Co., supra,* footnote 8, at page 371, and cases there cited.

is that of the annexor (in this case the farmer), and the question is whether he intends to make a permanent accession to the freehold. This intention is "not the actual subjective intent of the landowner making the annexation, but an objective and presumed intention of that hypothetical ordinary reasonable person, to be ascertained in the light of the nature of the article, the degree of annexation, and the appropriateness of the article to the use to which the realty is put."[11]

In several cases this court has held that, when the article in question is clearly adapted to and is in fact put by the owner of the realty to the use to which he has devoted the realty, this is conclusive evidence of an intent to make a permanent accession to the realty.[12] In his treatise on personal property, Brown states that where the property is placed upon a foundation particularly prepared for it, the factor of adaptation is manifest, and the intent to make a permanent annexation is almost certain.[13]

Here all of these objective circumstances are present, and thus it can be said as a matter of law that the average farmer, when purchasing a Harvestore, intends to make a permanent accession to his farm realty. The Harvestore is clearly adapted to the use to which the farmer devotes his real property and it is undisputed that the farmer afterwards uses the Harvestore for the storage and processing of fodder. Also, the Harvestore is affixed to a concrete foundation especially poured and formed for it. Finally, while not controlling, the factors of size, weight,

[11] Brown, *Personal Property* (2d ed. 1955), p. 726, sec. 141.

[12] *Premonstratensian Fathers v. Badger Mut. Ins. Co., supra,* footnote 8, at pages 372, 373; *McCorkle v. Robbins* (1936), 222 Wis. 12, 17, 267 N. W. 295; *State ex rel. Gisholt Machine Co. v. Norsman* (1919), 168 Wis. 442, 446, 169 N. W. 429; *Hannon v. Kelly* (1914), 156 Wis. 509, 146 N. W. 512; *Gunderson v. Swarthout* (1899), 104 Wis. 186, 80 N. W. 465.

[13] Brown, *supra,* footnote 11, at p. 720, sec. 140.

and cost of moving are certainly relevant to the issue of intention. The most popular model of Harvestore stands 70 feet high and is 20 feet around. It weighs about 35,000 pounds. It costs about $7,000 to move, because it must be taken down piece by piece and then reconstructed in the same way. All of these factors, taken together, conclusively establish that a farmer-purchaser intends to make the Harvestore a permanent accession to his realty.

The commission made no determination regarding the intention of the farmer. It did make certain findings of fact which the respondent relies upon to support an inference that the farmer intends to regard the Harvestore as personal property.

The most important of these findings is that the Harvestore is financed under the Uniform Commercial Code as personal property. The evidence supporting this finding is unequivocal. Representatives of several banks, credit associations, and finance companies testified that they uniformly financed Harvestores as personal property. However, this is not at all determinative of the question of whether the Harvestore is personal property for other than the limited purpose of short-term financing. As noted above, the crucial element of intention must be determined from objective circumstances, and not from subjective agreements between the annexor and other parties. Indeed, Brown specifically states that "it is no concern to the question of fixture or not, that the landowner . . . put a chattel mortgage on [the property in question]."[14]

Other factors relied upon by the respondent are the findings of the commission that Harvestores are traded in, and that there is a market for used Harvestores. That Harvestores are traded in for a larger or different model is of no consequence to the question of intention to make

[14] Brown, *supra*, footnote 11, at pp. 726, 727, sec. 141.

a permanent accession. This is because, as noted in regard to an electric dynamo in *Gunderson v. Swarthout*,[15] the fact that one model may be supplanted by another model is perfectly consistent with an intention to have some structure of that type permanently affixed to the realty. As for the market in used Harvestores, Lester Helgesen, the largest Harvestore dealer in the world, testified that he had sold about 15 used Harvestores in a year, as compared with 400 new Harvestores. Thus, the sale of used Harvestores only amounts to 3.6 percent of total Harvestore sales for this dealer. Moreover, this used Harvestore market is not inconsistent with an intention of permanence on the part of farmers. Insofar as the used Harvestores are trade-ins, the inference of permanent intent remains, as explained above. Insofar as they are repossessed Harvestores, or Harvestores which have had to be taken down because of urban expansion or the like, the general inference still prevails, because both of these situations are extraordinary events which would not be anticipated by the farmer at the time of annexation.

The respondent also relies upon the commission finding that Harvestores can be removed without material injury to the realty or to the unit itself. This is done by removing the bolts and leaving the concrete foundation in place. Yet this is an expensive procedure, costing around $7,000. In any event, as this court recently noted, "the element of removability without material damage [to the realty] no longer enjoys the position of prominence in the law of fixtures which it once held."[16] The purpose of this requirement was to insure that the property of the mortgagee or owner was not damaged by a removing tenant or vendor. In a tax setting this factor is entitled to very little weight.

[15] *Supra*, footnote 12, at page 192.
[16] *Premonstratensian Fathers v. Badger Mut. Ins. Co., supra,* footnote 8, at page 369.

Some evidentiary support for the conclusion that Harvestores are realty can be found in the testimony of Eugene Hafner, a supervisor of assessment standards for the department of revenue. He testified that he knew of one instance where a local assessor in Kenosha county had assessed the Harvestore as realty. He also stated that the department, in its manual of recommended procedures for local assessors, characterized all silos, including glass-lined steel silos like the Harvestore, as realty. Finally, he testified that the state regarded Harvestores as realty for the purpose of property-tax equalization.

Legal support for the conclusion that Harvestores are realty can be found in the case of *Wolfe Tax Appeal.*[17] This is a Pennsylvania lower-court decision which specifically held that a Harvestore was realty and not personalty, for the purpose of property-tax assessment. Although, as the respondent points out, some of the conclusions in that case would not be warranted on the record presently before this court, nevertheless, we find this opinion to be generally well-reasoned and persuasive:

". . . When we consider giving appellant the benefit of every doubt, as we are required to do, we find it impossible to classify the Harvestore after construction as a chattel or an item of personal property. In view of its massive size, the firm and permanent manner in which it is erected on a most substantial foundation, its purpose and function, the expense and size of the task and difficulty of removing same, and that it is not included as a fixture in another building, we are inclined to hold that it falls within the generally accepted classification of real estate and, under the above recited statute, taxable as such."[18]

---

[17] (1966), 42 Penn. D. & C. 2d 119, affirmed *per curiam sub nom. Wolfe v. Board of Assessment & Revision of Taxes*, 209 Pa. Super. Ct. 779, 230 Atl. 2d 922.

[18] *Wolfe Tax Appeal, supra*, footnote 17, at pages 124, 125. *See also: Aldrich v. Murphy* (1973), 42 A. D. 2d 385, 348 N. Y. Supp. 2d 384 (purchases of staves, hoops and clamps for use in construction of completed silos on real property constituted taxable retail sales).

Finally, it must be conceded that respondent relies heavily upon cases and authorities that refer to trade fixtures, or to relations between landlords and tenants.[19] This court has pointed out the fallacy of carrying over fixtures cases in one classification to another classification, where the status and relations of the parties are different.[20] Such a warning is especially appropriate in this case. Where a tenant installs fixtures, there is a presumption that they are temporary and that he intends to remove them at the end of the lease period. In fact, the appellant here concedes that it does not regard as fixtures those relatively few Harvestores sold to tenant farmers. The rule is different, however, when an owner purchases a structure, and has it erected on realty which he owns.[21] In such a case there must be a marked tendency to regard the annexed property as realty, as long as the other criteria are satisfied.

*By the Court.*—Judgment reversed.

[19] *Mt. LaCrosse, Inc. v. Dept. of Revenue* (Circ. Ct., Dane county, July 22, 1969), CCH Wis. Tax Rptr., Transfer Binder, New Matters 1966–1974, p. 10,452, secs. 200–524; *Standard Oil Co. La Crosse Super Auto Service, supra,* footnote 8; *Schields v. Hansen* (1930), 201 Wis. 349, 230 N. W. 51; *State ex rel. Hansen Storage Co. v. Bodden* (1917), 166 Wis. 219, 164 N. W. 1009; Technical Information Memorandum S–11.3.

[20] *Thomsen v. Cullen* (1928), 196 Wis. 581, 599, 219 N. W. 439.

[21] For cases recognizing the distinction between tenant cases and other cases, *see: Thomsen v. Cullen, supra,* footnote 20; *State ex rel. Gisholt Machine Co. v. Norsman, supra,* footnote 12, at page 445.